# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| FIRST LUTHERAN CHURCH, | Civil No. 18-954 (JRT/KMM) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| THE CITY OF ST. PAUL, | |
| Defendant. | |

Thomas P. Kane and Evan Berquist, **COZEN O'CONNOR**, 33 South Sixth Street, Suite 3800, Minneapolis, MN 55402, for plaintiff.

Portia M. Hampton-Flowers, **ST. PAUL CITY ATTORNEY**, 15 West Kellogg Boulevard, Suite 750, St. Paul, MN 55102, for defendant.

First Lutheran Church brings this action against the City of St. Paul, Minnesota, alleging violations of its rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), as well as its rights under the constitutions of Minnesota and the United States, including the First Amendment. First Lutheran claims that the City violated its rights when the City imposed fourteen conditions as part of a Determination of Similar Use regarding First Lutheran's partnership with a nonprofit dayshelter that operates out of First Lutheran's basement. One of those conditions requires that a sign be posted restricting after-hours use of First Lutheran's property so that the City can enforce trespassing laws, even though First Lutheran wants to permit such after-hours use of its property. Another condition limits the number of guests to twenty per day.

First Lutheran moves for a preliminary injunction on its RLUIPA and First Amendment claims, and it asks the Court to enjoin enforcement of all the imposed conditions.  Because First Lutheran has shown that it is entitled to a preliminary injunction with respect to the sign-posting requirement and the twenty-person limit, the Court will grant First Lutheran's motion in part and enjoin the City from enforcing those two conditions.

## BACKGROUND

### I.     FACTUAL BACKGROUND

First Lutheran Church is located in a residential area of St. Paul, Minnesota.  (*See* Compl. ¶¶ 7-9, Apr. 6, 2018, Docket No. 1.)  Supporting poor and homeless individuals has always been an important part of First Lutheran's religious identity.  (*Id.* ¶¶ 8-9.)  Over the last decade, First Lutheran has undertaken numerous steps in furtherance of its religious mission to assist the poor and homeless.  (*Id.* ¶¶ 10-11.)  For example, First Lutheran served breakfast to over 300 people each Sunday over a three-year span.  (*Id.* ¶ 12; *see* Decl. of Chris O. Bingea ("C. Bingea Decl.") ¶¶ 6-7, May 21, 2018, Docket No. 25.)  First Lutheran also established a "Wellness Center" on its property where its volunteers and partners provide services to approximately 80-150 people one evening per week, including:  free blood pressure checks and health assessments; free mental health counseling; free clothing, blankets, and housewares; free holistic therapy; and a hot meal.  (Compl. ¶ 13; *see* Decl. of Margaret D.A. Peterson ("M. Peterson Decl.") ¶ 4, May 21, 2018, Docket No. 26.)  First Lutheran also has a "Ministering Angels" program that operates on First Lutheran's

property and provides gently used clothing and household items to the needy.  (Decl. of

Darlissa A. McDonald ("McDonald Decl.") ¶ 3, May 21, 2018, Docket No. 31.)

Listening House of St. Paul is a nonprofit dayshelter and community center that

focuses on providing hospitality and practical assistance to the disadvantaged, homeless,

or lonely.  (Compl. ¶ 16.)  For over 33 years, Listening House operated in downtown St.

Paul, approximately half a mile from City Hall.  (*See id.* ¶ 17.)  In 2016, First Lutheran

learned that Listening House needed a new location, and in early 2017, First Lutheran

agreed to allow Listening House to operate out of First Lutheran's basement.  (*Id.* ¶¶ 23,

30.)

Both saw the partnership as a natural match.  First Lutheran's Council President is

a clinical social worker with a 30-year history with Listening House.  (Decl. of Bret Byfield

("Byfield Decl.") ¶¶ 2, 6, May 21, 2018, Docket No. 30.)  Listening House's Executive

Director attends First Lutheran.  (Decl. of Cheryl Peterson ("C. Peterson Decl.") ¶¶ 1, 5,

May 21, 2018, Docket No. 28.)  First Lutheran saw Listening House's "commitment to

helping those in need with practical and holistic assistance" as  "precisely what First

Lutheran had been attempting to provide its community for decades." (Compl. ¶ 19.)  Their

partnership would enable First Lutheran to expand its ministries and services beyond the

neighborhood and into more of St. Paul.  (*Id.* ¶ 20.) For example, Listening House's

established reputation as a welcoming dayshelter for the homeless reduced the need for

First Lutheran to separately provide similar services to the neighborhood and broader

community.  (Byfield Decl. ¶ 6.)  Additionally, Listening House could provide First

Lutheran with access to previously unavailable resources, such as full-time social workers. (Compl. ¶ 70(c).)

Before Listening House opened its doors at its new location, it sought guidance from the City. (*Id.* ¶ 24.) Listening House was told that First Lutheran needed to apply for a Determination of Similar Use. (Decl. of Brenda O. Bingea ("B. Bingea Decl.") ¶¶ 4-5, May 21, 2018, Docket No. 29.) First Lutheran claims that it never had needed to apply for such a Determination before, even though "First Lutheran houses and rents its space many non-profit tenants, some of which provide similar services to Listening House and serve more guests than Listening House." (*Id.* ¶ 7.)

In February 2017, First Lutheran applied for a Determination of Similar Use. (Compl. ¶ 25, Ex. A.) The following month, a City inspector approved First Lutheran's application. (FL00205.)[1] The Determination stated that Listening House's use of First Lutheran's basement would be "similar in character" to "the uses provided by First Lutheran," such as its Wellness Center and Ministering Angels, and that Listening House's use would be "similar to other accessory church-related programs." (FL00204.) The Determination relied, in part, on an analogous 2004 application by St. Mary's church to hold a yoga class on its church property. (*See id.*) The only three conditions the City imposed were: (1) that Listening House be "limited to uses that are low profile, generate limited traffic, are compatible with the church's presence in the community, and have the

---

[1] References to documents with the bates numbers FL__ are to the administrative record concerning Resolution 18-145. (Decl. of Thomas P. Kane ¶ 3, Ex. A, Apr. 10, 2018, Docket No. 8.)

potential to complement the activities of the church," (2) that Listening House "meet the standards and conditions for 'home occupation' as listed in" the City's Zoning Code, and (3) that First Lutheran work with Listening House to prevent traffic and congestion on neighborhood streets.  (FL00205.)   Listening House then moved into First Lutheran's basement and opened its doors on June 5, 2017.  (Compl. ¶ 30.)

The partnership appears to have proven to be the natural match that both had hoped for.  Listening House serves approximately 50-60 guests per day.  *See* St. Paul City Council Hr'g at 1:16:57-1:17:30 (Dec. 6, 2017).[2]  Many regular guests at Listening House became First Lutheran members, and members of First Lutheran's staff and volunteers became Listening House volunteers.  (C. Bingea Decl. ¶¶ 13-14.)   On the weeknight that First Lutheran hosts its Wellness Center, one-third to one-half of the Wellness Center guests are also Listening House guests.  (M. Peterson Decl. ¶ 4.)  Listening House guests also help First Lutheran volunteers set up for the evening's Wellness Center.  (McDonald Decl. ¶ 7.) Listening House also allowed First Lutheran to provide previously unavailable resources, including employment help, computer services, and housing assistance.  (Decl. of George L. Gevan ("Gevan Decl.") ¶ 18, May 21, 2018, Docket No. 32.)  For Listening House, the new location proved to be a more controlled environment with better security and more volunteers, and guests were more respectful of the physical space.  (*Id.* ¶ 8.)

Notwithstanding the benefits of this partnership, acrimony quickly brewed nearby. According to First Lutheran, "a subset of several neighbors made it clear that they were

---

[2] Available at http://stpaul.granicus.com/MediaPlayer.php?view_id=37&clip_id=3255.

opposed to Listening House and its visitors' presence" in the neighborhood.  (Compl. ¶ 31.)

Neighbors complained to the City of increased foot traffic and people sleeping outside, and

of an increase in petty offenses such as littering and public intoxication and urination.

Neighbors documented their complaints by, in part, taking photographs of people (*e.g.*,

FL00110-142, 231-270), despite being told by police not to (FL00122).   Although the

neighbors complained to the City and the police about unlawful behavior such as littering,

trespassing, public urination, and vandalism (*e.g.*, FL00140, 141, 268), they also expressed

frustration that police could not change lawful behavior that the neighbors disliked.   For

example, a neighbor stated that a person was "sleeping under a blanket on a bench outside

of Listening House" between 7:00am and 11:30am.  (FL00097.)  The neighbor "called the

police and an officer responded, but because the church is private property and L[istening]

H[ouse] staff are fine with people living outside their doors, the officer told us that there is

nothing he can do."  (*Id.*; *see also* FL00122.)  On another occasion, a neighbor admitted to

police that he took a picture of a man sitting on Listening House's steps "because the

'listening is closed,'" even though the man was not being disorderly or causing a public

nuisance.  (FL00064.)  The neighbor told police "I will do everything I can to shut that

place down."  (*Id.*)  And on another occasion, a neighbor called the police because a man

was resting on a bench on First Lutheran's property with First Lutheran's permission.

(FL00057.)  The neighbor "was unhappy with the legal authority of the police in this

situation when [police] explained to him."  (*Id.*)  Even if police were not called, neighbors

took pictures of people engaged in lawful behavior, such as church volunteers eating lunch

"picnic-style" on the church lawn.  (Gevan Decl. ¶ 21.)

## II.  PROCEDURAL BACKGROUND

The St. Paul Zoning Code requires that any appeal of "a decision of the planning or zoning administrator" be filed within ten days of that decision.  St. Paul Zoning Code § 61.701(c).  On July 3, 2017 – less than a month after Listening House opened and more than three months after the City's decision – the City informed First Lutheran that it was inviting appeals of its Determination of Similar Use.  (FL00208.)  First Lutheran alleges that "[p]roviding notice of a right to appeal a determination of similar use is not required under statutes, nor does the Zoning Administrator have a written policy to do so." (Compl. ¶ 37.)  Several of First Lutheran's neighbors appealed the inspector's determination of similar use to the Zoning Committee.  (*Id.* ¶¶ 38-44.)  After a public hearing – and after the neighbors, the City, First Lutheran, and Listening House tried to settle their disagreements – the Zoning Committee recommended granting the neighbors' appeal, which would have shut down Listening House.  (*Id.* ¶¶ 43-49.)

Listening House objected to the Committee's recommendation to the Planning Commission.  (*Id.* ¶ 50.)  The Commission adopted a middle-of-the-road approach.  It voted to deny the neighbors' appeal in part and modify the Determination of Similar Use, adding eleven conditions.  (*Id.* ¶ 52.)  The fourteen total conditions imposed are:

> 1.  The nonprofit tenant is limited to uses that are low profile, generate limited traffic, are compatible with the church's presence in the community, and have the potential to complement the activities of the church.
>
> 2.  Tenants shall meet the standards and conditions for "home occupation" as listed in Section 65.141 b, c, g and h of the Zoning Code, . . . .

(b) A home occupation shall not involve the conduct of a general retail or wholesale business, a manufacturing business, a commercial food service requiring a license, a limousine business or auto service or repair.

(c) A home occupation shall be carried on whole[ly] within the main building. No occupation shall be allowed in detached accessory structures or garages.

(g) There shall be no exterior storage of equipment, supplies, or overweight commercial vehicles, nor parking of more than one (1) business car, pickup truck or small van, nor any additional vehicles except one business car, pickup truck or small van, nor any additional vehicles except those for permitted employees associated with the home business.

(h) There shall be no detriments to the residential character of the neighborhood due to noise, odor, smoke dust, gas, heat, glare, vibration, electrical interference, traffic congestion, number of deliveries, hours of operation, or any other annoyance resulting from the home occupation.

3.  The church shall work with Listening House to prevent scheduling of multiple events that, taken together, would generate considerable traffic and congest neighborhood streets.

4.  Hours of operation shall be limited to 9:00 AM to 5:00 PM.

5.  Listening House will ensure that guests have left the area after Listening House has closed and will provide bus fares to its guests. Listening House staff must be on-site for two hours before and two hours after the times guests are served at the facility.

6.  Listening House will not allow the consumption of alcohol or controlled substances anywhere on the First Lutheran Church properties.

7.  Listening House will call emergency services when a guest is engaged in behavior that is harmful to self or others.

8.  Listening House will give notice on a shared Google site of serious incidents observed that involve their guests.

9.  No outdoor patio may exist anywhere on church grounds during Listening House's tenancy.

10. A sign must be posted in a plainly visible location to restrict after-hours use of the church grounds so as to aid in the enforcement of trespassing violations by Listening House guests or other persons when Listening House is closed.

11. Listening House will attend community policing meetings as invited by the Saint Paul Police Department.

12. Listening House will review on a daily basis their own camera footage and an online log maintained by neighbors in order to identify issues of concern and potential intervention.

13. Listening House will post guest policies regarding "good neighbor" expectations and consequences, including suspension or barring from Listening House and the church properties. Such policies must be readily visible to guests. Also, the policies must be provided to neighbors and the Zoning Administrator upon request.

14. The number of guests will generally be limited to 20 per day. . . .

(FL00143-146.)  In support of the additional conditions imposed, the Commission made two findings.  First, that Listening House "has not operated like a home occupation because of its detrimental effect on the neighborhood, with an increase in issues such as littering, public urination, and sleeping in outdoor public and private spaces causing such detriment, including during hours when the facility is closed."  (FL00144.)  Second, the City found that Listening House "has not been compatible with the church's presence in the community."  (*Id.*)

- 9 -

Both Listening House and the neighbors appealed the Planning Commission's decision to the City Council.  (Compl. ¶¶ 54, 56.)  During the City Council's public hearing in December 2017, City Planner Bill Dermody was asked about the Planning Commission's basis for imposing the twenty-person limit.  St. Paul City Council Hr'g at 1:10:20.  He stated:

> We do have some guidance from the previous approval of another church with the yoga use where that use was limited to ten persons per day to make it act like an accessory use and be clearly incidental.  On that site, ten per day has worked.  We haven't had issues or complaints at that site.  And so, if ten worked on that site, hopefully twenty would work on this, on this site.

*Id.* at 1:10:30-1:10:55.  The City Council denied both appeals and passed Resolution 18-145, which adopted the Planning Commission's recommendation.  (Compl. ¶¶ 61-62.)  Resolution 18-145 is the City's final decision on the matter.  (*Id.* ¶ 62.)

First Lutheran then brought this action in federal court.  First Lutheran alleges violations of RLUIPA in two ways:  (1) Resolution 18-145 substantially burdens First Lutheran's religious exercise, does not further a compelling government interest, and is not the least restrictive means of furthering the City's interest(s); and (2) Resolution 18-145 subjects First Lutheran to restrictions and conditions not imposed on nonreligious assemblies in the same zoning district.  (*Id.* ¶¶ 71-92.)  First Lutheran also alleges that Resolution 18-145 violates First Lutheran's First Amendment rights to free exercise of religion, free speech, and free assembly.  (*Id.* ¶¶ 109-141.)

On May 11, 2018, a City inspector came to Listening House for an inspection.  (M. Peterson Decl. ¶ 14.)  The inspector said that she or other inspectors would be continuing

to ensure "compliance with the zoning conditions." (C. Peterson Decl. ¶ 16.) The inspector also told Listening House's Executive Director that Listening House violated the twenty-person limit every day that the inspector was there. (*Id.*)

First Lutheran moves for a preliminary injunction, asking the Court to enjoin enforcement of Resolution 18-145 against First Lutheran.

## DISCUSSION

## I.   JUSTICIABILITY

The Court must decide whether the present action is justiciable. The City argues that First Lutheran lacks standing and that this action is not ripe.

### A.   Standing

"The 'irreducible constitutional minimum of standing' is that a plaintiff show (1) an 'injury-in-fact' that (2) is 'fairly . . . trace[able] to the challenged action of the defendant' and (3) is 'likely . . . [to] be redressed by a favorable decision' in court." *ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 958 (8th Cir. 2011) (alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560). A plaintiff bringing a pre-enforcement challenge "satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible

- 11 -

threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

First Lutheran has shown an injury in fact because it alleges harm that is sufficiently particularized, imminent, and concrete. Its harm is unquestionably particularized because Resolution 18-145 names First Lutheran and its tenant. *See Spokeo, Inc.*, 136 S. Ct. at 1548. Its alleged harm is imminent because Resolution 18-145 is the City's final decision and because the City has begun to enforce it. *See Driehaus*, 134 S. Ct. at 2342. The penalties for noncompliance include revocation of the City's approval, St. Paul Zoning Code § 61.108, and the City has already sent an inspector to Listening House on at least one occasion to ensure compliance. And finally, the harm is concrete; First Lutheran alleges, among other things, an invasion of its legally protected interests under RLUIPA and the First Amendment. First Lutheran's allegation that Resolution 18-145 unlawfully restricts First Lutheran's ability to use its property for religious exercise constitutes sufficient injury in fact to confer standing. *See Church v. City of St. Michael*, 205 F. Supp. 3d 1014, 1028-29 (D. Minn. 2016) (holding that a church had standing when a city prevented the church from purchasing real property); *see also Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cty.*, 450 F.3d 1295, 1304 (11th Cir. 2006) ("[A] zoning restriction on property use constitutes an injury in fact.")

### B.     Ripeness

To determine whether an administrative decision is ripe for judicial review, courts examine both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967),

*abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  The fitness prong looks to whether the case would "benefit from further factual development" and targets for review cases that present purely legal questions.  *Pub. Water Supply Dist. No. 10 of Cass Cty., Mo. v. City of Peculiar, Mo.*, 345 F.3d 570, 573 (8th Cir. 2003).  The hardship prong looks to the harm a plaintiff would suffer, which includes both traditional damages and behavior modification that could result in the absence of judicial review.  *Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1038 (8th Cir. 2000).  Both of these factors must be satisfied "to at least a minimum degree."  *Id.* at 1039.  "In land use disputes – including those involving First Amendment and RLUIPA claims – ripeness requires a plaintiff to 'obtain a final, definitive position as to how it could use the property from the entity charged with implementing the zoning regulations.'"  *City of St. Michael*, 205 F. Supp. 3d at 1029 (quoting *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 348 (2d Cir. 2005)).

The present action is ripe.  First, this action is fit for judicial review.  Resolution 18-145 is the City's "final, definitive position."  *Murphy*, 402 F.3d at 348.  The City argues that further factual development is needed as to whether or how the Resolution will be violated and the City's response to such violations.  But it is axiomatic that a plaintiff need not violate a law before seeking judicial review.  *Driehaus*, 134 S. Ct. at 2342-43, 2347.  It suffices that Resolution 18-145 is final and that the City has begun to enforce it. *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 796 (8th Cir. 2016).  Second, First Lutheran would suffer hardship absent judicial review.   The penalties for noncompliance with the conditions for a determination of similar use include revocation of

the City's approval, and a violation of the Zoning Code is a misdemeanor.  St. Paul Zoning

Code §§ 61.108, 61.901.  Thus, Resolution 18-145 "requires an immediate and significant

change" in First Lutheran's conduct "with serious penalties attached to noncompliance."

*Abbott Labs.*, 387 U.S. at 153.  Moreover, given that violations of RLUIPA and the First

Amendment constitute irreparable injury in the preliminary-injunction context, *Elrod v.

Burns*, 427 U.S. 347, 373 (1976); *Powell v. Noble*, 798 F.3d 690, 702 (8th Cir. 2015), the

Court has little difficulty concluding that First Lutheran has shown "to at least a minimum

degree" that it would suffer hardship absent judicial review of Resolution 18-145, *Neb.

Pub. Power Dist.*, 234 F.3d at 1039.[3]

## II.    PRELIMINARY INJUNCTION

"A preliminary injunction is an extraordinary remedy never awarded as of right."

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The Court must consider

four factors in determining whether to grant preliminary injunctive relief: (1) the

probability that the moving party will succeed on the merits; (2) the threat of irreparable

harm to the moving party; (3) the balance of harms as between the parties; and (4) the

public interest.  *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776

(8th Cir. 2012) (citing *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.

1981) (en banc)).  "At base, the question is whether the balance of equities so favors the

---

[3] Moreover, the Supreme Court has recently "expressed disfavor for prudential doctrines that abdicate jurisdiction and has emphasized the duty federal courts have to exercise jurisdiction." *In re City of Detroit, Mich.*, 838 F.3d 792, 800 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 1584 (2017) (citing *Driehaus*, 134 S. Ct. 2334, 2347; *Lexmark Int'l, Inc. v. Static Cont. Components, Inc.*, 134 S. Ct. 1377, 1388 (2014); *Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012)).

movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.  The party requesting injunctive relief bears the burden of showing these factors.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

### A. Likelihood of success on the merits

Generally, a party seeking a preliminary injunction need only show that it has a "fair chance" of prevailing on the merits.  *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008) (en banc).  But a party seeking an injunction against a "presumptively reasoned democratic process" must make a higher showing:  a "likelihood" of prevailing on the merits.  *Id.* at 732.  "For 'administrative actions by federal, state or local government agencies,' the court may evaluate whether 'the full play of the democratic processes' was involved in enactment, then determine which standard would be more appropriate."  *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (quoting *Rounds*, 530 F.3d at 732 n.6).

Resolution 18-145 was the product of a presumptively reasoned democratic process. It was the product of:  the Zoning Administrator's initial determination of similar use; the neighbors' appeal of the Zoning Administrator's decision to the Zoning Committee; the Committee's public hearing on that appeal; negotiations among the City, First Lutheran, and Listening House; the Committee's follow-on meeting; First Lutheran's appeal of the Committee's decision to the Planning Commission; and both the neighbors' and Listening House's appeal of the Commission's decision to the City Council.  Because First Lutheran

asks the Court to enjoin enforcement of Resolution 18-145, the Court will evaluate whether First Lutheran has shown a likelihood of prevailing on the merits.

First Lutheran argues that it is likely to prevail on its claims under (1) RLUIPA's substantial-burden provision, (2) RLUIPA's equal-terms provision, (3) the Free Exercise Clause of the First Amendment, and (4) the Speech and Assembly Clauses of the First Amendment.   The Court will conclude that First Lutheran is likely to prevail on its RLUIPA substantial-burden claim with respect to the sign-posting requirement and the twenty-person limit.   First Lutheran is also likely to prevail on its free-speech claim with respect to the sign-posting requirement.   But First Lutheran has not shown at this early stage that it is likely to prevail on its claims with respect to the other conditions in Resolution 18-145.

### 1.   RLUIPA - Substantial Burden

RLUIPA provides:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution – (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).   Under the RLUIPA, "[t]he term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief," and "[t]he use . . . of real property for the purpose of religious exercise shall be

considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." *Id.* § 2000cc-5(7).

The RLUIPA employs a modified burden-shifting framework. "If a plaintiff produces prima facie evidence to support a claim alleging a violation of . . . [42 U.S.C. § 2000cc], the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the . . . government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." 42 U.S.C. § 2000cc-2(b).

### a.    Substantial Burden on Religious Exercise

The Court must determine whether any conditions in Resolution 18-145 substantially burden First Lutheran's religious exercise.

First Lutheran's partnership with Listening House is a form of First Lutheran's religious exercise. The partnership is a "use . . . of real property" because First Lutheran permits Listening House to operate on church grounds, and that use is "for the purpose of religious exercise" because Listening House and First Lutheran together serve the homeless, the needy, and the poor in myriad ways consistent with First Lutheran's mission and historical practice. *See* 42 U.S.C. § 2000cc-5(7). Thus, the question becomes whether any of Resolution 18-145's conditions impose a substantial burden on First Lutheran's partnership with Listening House.

"Neither the Supreme Court nor the Eighth Circuit has defined 'substantial burden' in the context of RLUIPA. Multiple circuit courts, however, have considered the question . . . ." *City of St. Michael*, 205 F. Supp. 3d at 1033-34 (collecting cases). "[W]hile these

courts do not entirely agree," *id.*, the Court concludes that a government regulation substantially burdens an exercise of religion when the regulation's effects go beyond being an inconvenience to a religious institution, and instead put substantial pressure on the institution to change that exercise.   *See, e.g., Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548, 556 (4th Cir. 2013); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004); *see also Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 737 (6th Cir. 2007); *Vision Church, United Methodist v. Vill. of Long Grove*, 468 F.3d 975, 997 (7th Cir. 2006).

### (i)    Sign-Posting Requirement

Resolution 18-145 requires that "[a] sign must be posted in a plainly visible location to restrict after-hours use of the church grounds so as to aid in the enforcement of trespassing violations by Listening House guests or other persons when Listening House is closed."  This requirement is inapposite to both First Lutheran's preferred use of church property and its preferred message.   First Lutheran's mission and values are to be "welcoming all individuals where they are regardless of their current economic, physical, mental and social state," and part of First Lutheran's practice is "to welcome, serve and live among . . . those in need."  (C. Bingea Decl. ¶¶ 5, 15.)  According to First Lutheran's pastor:

> Unless a visitor was at risk of harming themselves or others, we would not ask them to leave the property.   They are welcome to rest and enjoy our property regardless of the time of day.  Requiring our church to put up a No Trespassing sign is contrary to the mission and teaching of our Church . . . .

(*Id.* ¶ 16.)   First Lutheran's purpose in allowing visitors to enjoy its property is to be welcoming and inviting to the homeless, lonely, and needy.   By limiting the use of First Lutheran's property after hours, the City is preventing First Lutheran from being welcoming for two-thirds of the day.   And by requiring that a sign be posted effectively saying, "You are welcome here only during business hours," further undermines First Lutheran's mission to be welcoming.   These effects are not mere inconveniences, but rather put substantial pressure on First Lutheran to change both its use of its property and the message it sends to the community in ways that are antithetical to First Lutheran's purpose, mission, and practice.   The sign-posting requirement imposes a substantial burden on First Lutheran's religious exercise.

### (ii)   Twenty-Person Limit

Resolution 18-145 generally limits the number of guests to twenty per day. Listening House serves approximately 50-60 guests per day, and the fire-code capacity for the church basement is 122.   (C. Bingea Decl. ¶ 17.)   In the past, First Lutheran has served breakfast to over 300 people each Sunday, and it currently serves approximately 80-150 people one evening a week at its Wellness Center.   The twenty-person limit severely undermines First Lutheran's mission, preferred practices, and message.   First, it reduces the actual number of guests served.   There is obviously demand for the services that First Lutheran and Listening House provide, and that demand vastly exceeds the limit the City imposed, and the per-day nature of the limit means that First Lutheran will be restricted to providing services to 20 people per day and will have to turn people away.   Because First Lutheran and Listening House want to serve – and can serve – well more than 20 people

per day, the limit undermines their mission to provide services to any many people as they can.  Second, the twenty-person limit reduces the ability to effectively recruit volunteers, especially professional volunteers such as licensed social workers, because volunteers may feel that their time could be better used at facilities that serve more people.  This restriction is likely to reduce both the number and types of services that First Lutheran and Listening House can provide.  And third, the twenty-person limit will result in an unwelcoming message being sent.  The limit will require that guests be turned away, even if the first 20 guests that cycled through Listening House that day are no longer on the premises.  Turning guests away – especially when there is the space for them – would undermine First Lutheran's message to be welcoming to the homeless, the lonely, and the needy. These effects are not mere inconveniences, but rather put substantial pressure on First Lutheran to change its partnership with Listening House. The twenty-person limit imposes a substantial burden on First Lutheran's religious exercise.

### (iii)    Resolution 18-145's Other Requirements

Although First Lutheran has shown that the sign-posting requirement and the twenty-person limit each impose a substantial burden on its religious exercise, First Lutheran has not shown – at this early stage and on this limited record – that the other twelve conditions in Resolution 18-145 impose a substantial burden on its religious exercise.  The other twelve conditions, both individually and collectively, appear to impose mere inconveniences on First Lutheran rather than exerting substantial pressure on First Lutheran to change is religious practices.

### b.    Compelling Government Interest

Because the Court concludes that only the sign-posting requirement and the twenty-person limit impose substantial burdens on First Lutheran's religious exercise, the Court will evaluate the remainder of First Lutheran's RLUIPA substantial-burden claim only with respect to those two conditions.

The City broadly asserts that Resolution 18-145 furthers the City's interests articulated in St. Paul Legislative Code § 60.103:

> (a) To promote and to protect the public health, safety, morals, aesthetics, economic viability and general welfare of the community;
> (b) To implement the policies of the comprehensive plan;
> (c) To classify all property in such manner as to encourage the most appropriate use of land throughout the city;
> (d) To regulate the location, construction, reconstruction, alteration and use of buildings, structures and land;
> . . .
> (i) To encourage a compatible mix of land uses, at densities that support transit, that reflect the scale, character and urban design of Saint Paul's existing traditional neighborhoods;
> . . .
> (l) To conserve and improve property values;
> (m) To protect all areas of the city from harmful encroachment by incompatible uses;
> (n) To prevent the overcrowding of land and undue congestion of population;
> (o) To fix reasonable standards to which buildings, structures and uses shall conform;

"[T]he city's interest in attempting to preserve the quality of urban life is one that must be accorded high respect." *Peterson v. City of Florence, Minn.*, 727 F.3d 839, 843 (8th Cir. 2013) (alteration in original) (quoting *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 71 (1976)).

With respect to the sign-posting requirement, the governmental interest furthered is the help the City needs to enforce trespassing.  The Resolution's text makes that clear.  Even assuming that aiding the enforcement of trespassing is a compelling governmental interest, entry onto First Lutheran's property after hours is not trespassing because  First Lutheran consents to people being on church property after hours.  *See* Minn. Stat. § 609.605, subd. 1(b) (defining criminal trespass); *Copeland v. Hubbard Broad., Inc.*, 526 N.W.2d 402, 404 (Minn. Ct. App. 1995) (defining civil trespass).  Thus, the resolution does not serve the City's interest in punishing or reducing trespassing because no trespassing occurs on First Lutheran's property.  Thus, the sign-posting requirement does not further a compelling governmental interest.

With respect to the twenty-person limit, the City claims that the condition furthers the governmental interest in maintaining the residential character of the neighborhood.  *See* St. Paul Legislative Code § 60.103(i), (l), (m).  The limit purportedly furthers this interest in two ways:  by reducing the number of guests and thereby preventing overcrowding of a residential neighborhood, and by reducing petty offenses allegedly committed by guests.  But, in practice, the limit is unlikely to further the City's interest in either way.

First, it is unclear whether or how the limit will reduce overcrowding.  As noted, demand is high for First Lutheran's and Listening House's services.  As news spreads about the twenty-person limit, it is likely that more prospective guests will line up early in hopes of being admitted, which would cause more overcrowding in the morning hours.  It is possible that overcrowding will be reduced later in the day if some prospective guests find out  that the twenty-person limit has already been reached.  But it is also possible that some

prospective guests will not receive word that the limit was reached (or that there is a limit at all) and will arrive at Listening House only to be turned away.  Turning people away will likely result in more people occupying First Lutheran's outdoor property and the neighborhood generally.  Ultimately, the Court is not persuaded that the twenty-person limit will reduce overcrowding.

Second, the limit is unlikely to reduce petty offenses.  To begin with, these offenses are not caused by First Lutheran or Listening House; rather, they are the understandable effects of homelessness and poverty, not the organizations that serve people who are homeless or poor.  If Listening House closed its doors tomorrow, its guests who are homeless or poor would still be homeless or poor, and the City would continue to experience the effects of homelessness and poverty.  Moreover, assuming that all of the petty offenses are committed by Listening House and First Lutheran guests – an assumption First Lutheran vigorously disputes – the twenty-person limit means that prospective guests will either be turned away and head into the nearby neighborhood (thereby possibly increasing the incidence of such petty offenses in the neighborhood) or remain in other areas of the City because they chose not to visit Listening House or First Lutheran in the first instance (thereby increasing the incidence of such petty offenses elsewhere in St. Paul).  Thus, the twenty-person limit does not further a compelling governmental interest.

### c.      Least Restrictive Means

Finally, the Court must determine whether the sign-posting requirement and the twenty-person limit are the least restrictive means of furthering the City's interests.

As to the sign-posting requirement, there are no means the City can take to enforce non-existent crimes or civil infractions. As long as First Lutheran consents to guests remaining on church property after hours, any sign-posting requirement so restricting after-hours use of church property is overly restrictive.

As to the twenty-person limit, the City has less restrictive means of furthering its interest in maintaining the residential character of the neighborhood. To begin with, the per-day character of the limit is overly restrictive. Listening House and First Lutheran operate on a mostly come-and-go basis, so they could serve twenty people by mid-morning and remain empty the rest of the day. Moreover, the number itself is overly restrictive. The City's comparison of Listening House to a yoga studio – simply because both are in a church – raises serious questions about whether the City can carry its burden to show that the twenty-person limit is the least restrictive means, given that the City gave the number only perfunctory consideration before imposing the twenty-person limit. Finally, the Court doubts on the present record that a numerical limit at all is the least restrictive means. At least with respect to petty offenses being committed in the neighborhood, again, First Lutheran and Listening House are not the cause of those offenses. First Lutheran suggests that a more robust police presence with a strong emphasis on true community policing will allow the City to maintain the residential character of the neighborhood without substantially burdening First Lutheran's religious exercise, or at least that such an arrangement would be the least restrictive means of serving the governmental interest. That might very well be true. But the Court need not determine what means is the least

restrictive; it suffices for the present motion to conclude that the twenty-person, per-day limit is not.

First Lutheran has shown that it is likely to prevail on its RLUIPA substantial-burden claim with respect to the sign-posting requirement and the twenty-person limit contained in Resolution 18-145.

### 2. RLUIPA - Equal Terms

RLUIPA also provides:

> No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

42 U.S.C. § 2000cc(b)(1). The same burden-shifting framework that applies to First Lutheran's substantial-burden claim applies to its equal-terms claim; that is, First Lutheran must "produce[] prima facie evidence to support [its] claim" before the burden of persuasion shifts to the City. 42 U.S.C. § 2000cc-2(b).

"[N]either the Supreme Court nor the Eighth Circuit has had occasion to establish a test for applying the equal terms provision" of RLUIPA. *City of St. Michael*, 205 F. Supp. 3d at 1035. The Court finds persuasive the reasoning of the Third and Seventh Circuits in *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 266-67 (3d Cir. 2007), and *River of Life Kingdom Ministries v. Village of Hazel Crest, Ill.*, 611 F.3d 367, 371 (7th Cir. 2010) (en banc), and concludes that a regulation will violate RLUIPA's equal-terms provision if it treats a religious institution less well than a secular institution similarly situated with respect to the regulatory purpose or the accepted zoning criteria.

*City of St. Michael*, 205 F. Supp. 3d at 1035.  This standard is consistent with the standard First Lutheran asks the Court to employ:  that "the comparison of use should be based on the underlying lawful, zoning-relevant interests at play (such as health, safety, and welfare) that the city seeks to regulate."  (Pl.'s Mem. Supp. Mot. Prelim. Inj. ("Mem. Supp.") at 27, Apr. 10, 2018, Docket No. 7.)

On the current record and at this early stage, First Lutheran has not shown a likelihood of prevailing on the merits of its equal-terms claim.  First Lutheran alleges that Resolution 18-145 puts it on less than equal terms with secular institutions in the same neighborhood and zoning district.  Specifically, First Lutheran argues that the twenty-person limit, the sign-posting requirement, and the patio ban do not apply to Metropolitan State University, Dayton's Bluff Library, or The Goat Coffee House.  (Compl. ¶ 66.)  But this unsupported allegation is the extent of First Lutheran's analysis and evidence.  The Court is not convinced – because First Lutheran has given no explanation – that these three institutions are appropriate comparators, i.e., similarly situated to First Lutheran with respect to the regulatory purposes of Resolution 18-145 or the RT1 zoning criteria.  *See City of St. Michael*, 205 F. Supp. 3d at 1036 (holding a church not similarly situated to a movie theater because "[a] church is not in the business of selling items to the public and, as a non-profit entity, does not generate taxable revenue").  Thus, First Lutheran has failed to show at this early stage and on this limited record that Metropolitan State University, Dayton's Bluff Library, or The Goat Coffee House are sufficiently similar to First Lutheran for purposes of its RLUIPA equal-terms claim.

This is not to say that First Lutheran cannot, on a more developed record, prevail on its equal-terms claim. For example, First Lutheran alleges that the City invited neighbors to appeal the City's Determination of Similar Use over three months after issuing it (substantially beyond the ten-day window provided in the Zoning Code), and that the City has never before done anything like that. If true, the Court would find that practice troubling, and such disfavored treatment could possibly form the basis for a permanent injunction against Resolution 18-145 in its entirety. But without more information about the City's practices, and on this limited record, the Court cannot conclude at this time that the City has treated First Lutheran on less than equal terms under RLUIPA.

### 3. Free Exercise

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. The Supreme Court's precedents make clear that the Free Exercise Clause is implicated only when government action is motivated by religion or religious-related reasons, irrespective of any effects that the government action might have on religious exercise. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019-21 (2017). Put another way, the essence of a free-exercise claim is coercion. *Jackson v. Nixon*, 747 F.3d 537, 541-43 (8th Cir. 2014); *see Nikolao v. Lyon*, 875 F.3d 310, 316 (6th Cir. 2017).

One cannot maintain a free-exercise claim simply because a government action affects religious practices—even if the effects are substantial or significant. *See Emp't Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 877 (1990) (noting that the government may not "impose special disabilities **on the basis of religious views or**

**religious status**" (emphasis added)); *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 449-51 (1988) ("[T]he exact line between unconstitutional prohibitions on the free exercise of religion and the legitimate conduct by government of its own affairs . . . cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development."); *Braunfeld v. Brown*, 366 U.S. 599, 603-04 (1961) ("[L]egislative power . . . may reach people's actions when they are found to be in violation of important social duties or subversive of good order, even when the actions are demanded by one's religion."); *Olsen v. Mukasey*, 541 F.3d 827, 832 (8th Cir. 2008) ("Absent evidence of an 'intent to regulate religious worship,' a law is a neutral law of general applicability." (quoting *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464, 472 (8th Cir. 1991))).[4] Indeed, it was the Supreme Court's limiting of free-exercise claims in *Smith* that prompted Congress to enact statutory protections against government action that affects religious practices, irrespective of the government's motive or purpose. *City of Boerne v. Flores*, 521 U.S. 507, 512 (1997).

Here, there is little evidence that the City attempted or is attempting to coerce First Lutheran into disavowing or abandoning its religious status or any of its religious beliefs, or that the City's adoption of Resolution 18-145 was motivated by First Lutheran's religious status or beliefs. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). The City initially approved First Lutheran's application for a

---

[4] To be clear, while the effects of government action on religious exercise might be **evidence** of a religion-related motive or purpose for that action, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993), the effects alone are not actionable under the Free Exercise Clause. *See Smith*, 494 U.S. at 877; *Lyng*, 485 U.S. at 449-51.

Determination of Similar Use.  Had the City been motivated by First Lutheran's religious status or beliefs, presumably the City would not have given its approval in the first place. Nothing on the face of Resolution 18-145 suggests that the City treated First Lutheran differently because of First Lutheran's religious status.  *See Trinity Lutheran*, 137 S. Ct. at 2019-21.

There is, however, evidence that is potentially concerning.  According to First Lutheran's pastor, a group of church officials met with City Councilwoman Jane Prince, at her request, in an attempt to reach a resolution before First Lutheran filed this action.  (C. Bingea Decl. ¶ 18.)  According to First Lutheran's pastor, Chris Bingea, "[d]uring this meeting, Jane Prince told the group that the City would never again allow a church to operate a shelter like this."  (*Id.*)  At least two other church officials corroborate Bingea's sworn statement.  (M. Peterson Decl. ¶ 13; Byfield Decl. ¶ 10.)[5]  Prince's statement begs the question:  why say that the City would not allow a church, as opposed to a secular institution, to operate a shelter?  On the one hand, Prince's statement, depending on the context, might reveal animus by the City to First Lutheran's religious status or beliefs.  *See Church of the Lukumi Babalu Aye*, 508 U.S. at 533.  But on the other hand, Prince might have been referring to First Lutheran's location in a residential district rather than to its status as a religious institution.  Thus, at this time, the record is unclear and First Lutheran has not shown that it is likely to prevail on its free-exercise claim.

---

[5] Councilwoman Prince's statement would likely not be inadmissible hearsay.  *See* Fed. R. Evid. 801(d)(2)(A), (C), (D).

### 4.        Free Assembly and Free Speech

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people peaceably to assemble."  U.S. Const. amend. I.  First Lutheran argues that the twenty-person limit violates its right to free assembly.  In modern First Amendment law, however, there is no free-standing right to free assembly.  "In 1983, the [Supreme] Court swept the remnants of freedom of assembly within the ambit of free speech law."  John D. Inazu, *The Forgotten Freedom of Assembly*, 84 TUL. L. REV. 565, 610 (2010) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)).

The twenty-person limit is a restriction on First Lutheran's conduct, not speech.  *See Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006).  And First Lutheran does not claim that the twenty-person limit "affects in a significant way" First Lutheran's "ability to advocate public or private viewpoints" such that would infringe First Lutheran's "freedom of expressive association." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000).  Thus, the twenty-person limit does not violate the First Amendment.

First Lutheran argues that Resolution 18-145's sign-posting requirement violates its right to free speech.  The sign-posting requirement is subject to strict scrutiny because it is compelled speech and because it is a content-based regulation.  Applying strict scrutiny, the sign-posting requirement is unconstitutional.

### a.        Compelled Speech

First Lutheran argues that Resolution 18-145 "compels speech from First Lutheran and its tenant by requiring First Lutheran to post a sign refusing access to its church

property after hours." (Mem. Supp. at 29.) To maintain its compelled-speech claim, First Lutheran must show that it is obligated "to express a message [it] disagrees with," and that that message is "imposed by the government." *Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 557 (2005). As stated earlier, First Lutheran does not want to restrict after-hours use of church property, so the sign-posting requirement compels First Lutheran to express a message it disagrees with. Because the sign-posting requirement is compelled speech, the Court must decide whether the sign-posting requirement passes strict scrutiny. *See Wooley v. Maynard*, 430 U.S. 705, 716 (1977).

### b. Content-Based Regulation

The sign-posting requirement is subject to strict scrutiny for a second reason: because it is content based. Determining whether a law or regulation is content based is a two-step inquiry. "[T]he crucial first step in the content-neutrality analysis" is "determining whether the law is content neutral on its face." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2228 (2015). "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)). A regulation is facially content based if it "depend[s] entirely on the communicative content of the sign," or is "targeted at specific subject matter." *Id.* at 2227, 2230. If, however, a law or regulation is content-neutral on its face, then the "inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with

the message it conveys," or whether the regulation "serves purposes "unrelated to the content of expression." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Resolution 18-145's sign-posting requirement fails step one. It is content based on its face. The requirement targets specific subject matter: consent to be on church property after hours. And First Lutheran's compliance with that requirement "depend[s] entirely on the communicative content of the sign." *Reed*, 135 S. Ct. at 2227. For example, a sign that simply stated the operating hours would not meet the City's requirement because the sign must also restrict after-hours use of the church grounds.

Resolution 18-145's sign-posting requirement also fails step two. It is content based under *Ward*'s purpose-based inquiry. The City's purpose in imposing the sign-posting requirement is evident from the face of Resolution 18-145: "to aid in the enforcement of trespassing violations by Listening House guests or other persons when Listening House is closed." This purpose is not "unrelated to the content" of the sign, *Ward*, 491 U.S. at 791, rather, it is completely tied to the City's wish that First Lutheran restrict access to its property between 5:00pm and 9:00am. As described earlier, First Lutheran consents to after-hours use of its property, so there is no trespassing. The City adopted the sign-posting requirement because it disagrees with First Lutheran's preferred message. Thus, the sign-posting requirement is a content-based regulation of speech, and strict scrutiny applies. *See id.*

### c.    Strict Scrutiny

Applying strict scrutiny, the sign-posting requirement violates the First Amendment. As analyzed earlier with respect to First Lutheran's RLUIPA substantial-

burden claim, the sign-posting requirement neither furthers a compelling governmental interest nor is the least restrictive means for doing so.

To be clear, the Court is not holding that the First Amendment precludes the City from limiting the after-hours use of First Lutheran's property altogether. Rather, the Court holds that the First Amendment precludes the City from accomplishing that goal in the particular way it has chosen, i.e., by requiring First Lutheran to post a notice purportedly withdrawing its consent to have after-hours guests on its property so that the City can more easily enforce trespassing laws.[6]

### B. Remaining *Dataphase* Factors

As to irreparable harm, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. "This principle applies with equal force to the violation of RLUIPA rights because RLUIPA enforces First Amendment freedoms, and the statute requires courts to construe it broadly to protect religious exercise." *Opulent Life Church*, 697 F.3d at 295 (citing 42 U.S.C. § 2000cc-3(g)). Because First Lutheran is likely to prevail on its First Amendment claim and its RLUIPA substantial-burden claim with respect to some of Resolution 18-145's requirements, First Lutheran has established the requisite threat of irreparable harm.

---

[6] First Lutheran also argues that the requirement that Listening House give notice on a shared Google site of "serious incidents," violates First Lutheran's free-speech rights. Notwithstanding the vague phrase "serious incidents," First Lutheran has not articulated how this reporting requirement, which plainly applies only to Listening House, burdens First Lutheran's speech.

As to the balance of harms, this factor favors First Lutheran.  The City is forcing First Lutheran to restrict use of its property for religious exercise, which unquestionably constitutes harm to First Lutheran.  The City argues that enjoining enforcement of Resolution 18-145 would impose an undue burden on the City and require increased management on its part.  But the City does not articulate how not enforcing two conditions out of fourteen – or these two conditions in particular – creates more work for the City.

As to public interest, this factor weighs slightly in First Lutheran's favor.  Although the public interest is served by City officials rendering decisions about property uses and implementing land-use regulations generally, the public interest is better served here by First Lutheran continuing to maintain a welcoming environment to the community, especially to the homeless, poor, and disadvantaged – especially because the Court will not enjoin the majority of the conditions in Resolution 18-145.

### C.    Bond

Federal Rule of Civil Procedure 65(c) states that the Court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The "amount of the bond rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion." *Stockslager v. Carroll Elec. Coop. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976).  "Courts in this circuit have almost always required a bond before issuing a preliminary injunction, but exceptions have been made where the defendant has not objected to the failure to require a bond or where the damages resulting from a wrongful issuance of an injunction have not

been shown." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engr's* , 826 F.3d 1030, 1043 (8th Cir. 2016) (citations omitted).  The City has not objected to waiver of the bond requirement nor demonstrated any costs or monetary damages that may result from issuance of the injunction.  Under the circumstances, the Court will exercise its discretion to waive Rule 65(c)'s bond requirement.

## CONCLUSION

The Court finds that First Lutheran has shown that it is likely to prevail on the merits of its RLUIPA substantial-burden claim with respect to the sign-posting requirement and the twenty-person limit and that it is likely to prevail on its free-speech claim with respect to the sign-posting requirement.  The remaining *Dataphase* factors also favor First Lutheran.  As such, First Lutheran has shown that it is entitled to a preliminary injunction with respect to those two conditions.  The Court will grant First Lutheran's motion in part and enjoin the City from enforcing the sign-posting requirement and the twenty-person limit.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for a Preliminary Injunction [Docket No. 5] is **GRANTED IN PART**.  The City of St. Paul and all others acting in concert with it are hereby **PRELIMINARILY RESTRAINED AND ENJOINED** as follows:

1.      The City of St. Paul and all others acting in concert with it shall not enforce the requirement in St. Paul City Council Resolution 18-145 that requires that a sign be posted restricting after-hours use of the church grounds; and

2.      The City of St. Paul and all others acting in concert with it shall not enforce the requirement in St. Paul City Council Resolution 18-145 that limits the number of guests to 20 per day.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  July 2, 2018                          _____s/John R. Tunheim_____
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                     Chief Judge
                                            United States District Court